STATE OF MISSOURI, Respondent, v. THOMAS J. HENDRIX, Appellant.

**St. Louis Court of Appeals, January 15, 1901.**

1. **Criminal Law:** PRACTICE, CRIMINAL: INFORMATION: KNOWLEDGE OF PROSECUTING ATTORNEY: Where there is nothing in the record which tends to show that the prosecuting attorney who filed an information against defendant for wife abandonment was not in fact possessed of the knowledge which he swore he had, the information is good under sections 2477-2479, Revised Statutes 1899.

2. ———: ———. In the case at bar it was competent to introduce evidence that defendant, on an *ex parte* hearing for divorce from his wife, was denied a decree of divorce, since this, in connection with other testimony in the case, tended to prove the intention of defendant to get rid of his wife entirely, instead of to support her as he testified he always meant to do.

Appeal from Dunklin Circuit Court.—*Hon. J. L. Fort,* Judge.

AFFIRMED.

*C. P. Hawkins* and *Mayes & Scobey* for appellant.

(1) The information is bad because it is not based upon the personal knowledge of the prosecuting attorney, or the affidavit of any person having personal knowledge of the offense. The letter and spirit of the law requires the information to be predicated upon the personal knowledge of some person, either the prosecuting attorney or an informer. State v. Wilkson, 36 Mo. App. 373; State v. Buck, 43 Mo. App. 443; State v. Hatfield, 40 Mo. App. 358. As Judge SMITH, who gave the opinion in the case of the State v. Humble, 34 Mo. App. 343, says, "these statutory provisions, taken by themselves, no where countenance the idea that such an information can be filed upon the bare information and belief of

Vol 87 app—2

the presecuting attorney, ·and unless that information and belief has for its foundation an affidavit made by a person who has knowledge that an offense has been committed, which must either accompany the information or be referred to therein, it is insufficient to authorize the filing of such criminal information by the prosecuting attorney." The grand jury has no right to request a prosecuting attorney to file information upon testimony adduced before them. The information further fails to state that the information was filed upon the prosecuting attorney's own knowledge, information or belief (omitting the word "information.") This is insufficient and unwarranted. State v. Sartin, 66 Mo. App. 626; State v. White, 55 Mo. App. 360; State v. Lewis, 70 Mo. App. 40. (2) If the wife leaves the home of her husband, without just and reasonable cause, and then returns and asks admission to his home again, and he refuses to consent for her to live with him, or to provide for her; this is no abandonment. The State must prove that the alleged abandonment was without good cause and with a criminal intent, and that defendant with a criminal intent failed to provide for his wife. It was incumbent upon the State to prove the abandonment was without good cause and with a criminal intent, for mere separation is not abandonment. State v. Doyle, 68 Mo. App. 221. (3) The court erred in permitting counsel for State to introduce the separate files and the record of a divorce suit which had been decided in the circuit court of Dunklin county, over one year prior to this trial.

*D. R. Cox* and *W. S. C. Walker* for respondent.

(1) .The information is good. It is verified by the prosecuting attorney, "upon his own knowledge and belief," and it contains the averment at the beginning of the allegations that it is so filed. The verification by the prosecuting attor-

ney may be upon "information and belief." R. S. 1899, sec. 2477; State v. Bennett, 102 Mo. 356; State v. Hayward, 83 Mo. 299; State v. Armstrong, 106 Mo. 395. (2) It is not necessary that the prosecuting attorney shall state in the information how he acquired his knowledge or information, and the formal charge surely does not lose its validity because he made a memorandum on the back of the information showing that he acquired his information from the grand jury. Appellant quotes authorities which are decided upon ·cases in which the information of the prosecuting attorney was not verified by himself. When it is so verified, it is not necessary for it to be based upon the affidavit of a third person. State v. Sweeney, 56 Mo. App. 409; State v. O'Conner, 58 Mo. App. 457.

GOODE, J.—The appellant was convicted of wife abandonment on an information filed in the circuit court of Dunklin county, and fined $100. Motions for a new trial and in arrest were filed which being overruled an appeal was taken. The sufficiency of the information is challenged on the ground that it was not based on the personal knowledge either of the prosecuting attorney or some informer. It appears there was a pencilled memorandum on the back of the indictment containing these words "Filed at the request of the grand jury." Appellant contends the memorandum shows it was not on the prosecuting attorney's own knowledge that it was presented. There is no merit in the suggestion. It is not even shown who wrote those words and they are certainly not a part of the pleading itself. The information scrupulously follows the form prescribed for informations filed by the prosecuting attorney in courts of record, while the affidavit is stronger than the statute requires. It is as follows:

"D. R. Cox prosecuting attorney, makes oath and says

the facts in the foregoing information are true according to his best knowledge and belief.

"D. R. Cox, Prosecuting Attorney.

"Subscribed and sworn to before me this third day of December, 1898.          W. S. GARDNER, Notary Public."

The prosecuting attorney has the right and it is his duty when he has knowledge that a crime has been committed which is punishable on information, to present the offender in that manner. There is nothing in the record which tends to show that the officer who filed the information in this case was not in fact possessed of the knowledge which he swore he had. The information is good. R. S. 1899, sec. 2477-2479.

No exceptions were saved to the instructions given by the court, but there was a demurrer to the State's evidence, and it is now claimed there was no evidence to authorize the verdict. The reasons assigned in support of this position are these: that defendant's wife left him voluntarily; that cessation of cohabitation and the intention on the part of the defendant not to resume cohabitation were not proven; that it was not proven he abandoned his wife without good cause, and lastly, that the prosecutrix Nancy Hendrix had continued, after the date of the alleged desertion, to accept support from her husband. The case was tried by a jury and the foregoing matters were submitted to them by proper instructions to be found against the defendant as prerequisites to a verdict of guilty. Far from there being no evidence to support their finding, we consider the testimony conclusive and overwhelming that the defendant was brutally guilty in every respect. He and the prosecutrix were married in 1883. On two occasions prior to the final abandonment he left her, going off to Texas once it seems and returning after an absence of some months. He explained to his wife then, as she testified, that he had nothing against her, but a girl whom they had adopted threatened to

put him in the penitentiary on account of her being pregnant by him. The reason for his leaving the second time is not disclosed. It appears from the testimony of his wife as well as other witnesses, that some two years prior to June, 1898, at which time she claimed he entirely ceased to provide for her, he rented or built a house on his place about three quarters of a mile from the residence and moved his wife and children into it, forcing her to leave home. After this he carried on a criminal intimacy with a woman, Jane Bush, who had been put into the house by him some time before, ostensibly to help with the work. The testimony shows that this woman practically had charge of the place and that on one occasion when his wife Nancy came to the residence from the house where he had put her and his five children, on some hot words arising between her and Jane Bush, Hendrix got a switch and told his wife to leave the place and followed her in a threatening way. This is testified to by the defendant's uncle as follows: "This woman got into a dispute some way in the house; Nance (the wife) came out of the door. She was crying, Tom told her to go on out of the house then. She didn't start right quick and Tom picked up a brush and she started off and Tom followed her. I never saw him hit her. She kept walking off pretty peart and he kept following her." Nancy Hendrix testified to the same circumstance.

As to the charge that she and the children were supported by the defendant, her testimony is that in June, 1898, that is, six months before the information was filed, he entirely quit furnishing anything for them to live on. Before that time he did keep them up after a fashion, giving them some meat, bread, coffee and molasses so that "some days they had plenty and some days they didn't have enough."

She testified likewise that the house where she and the children lived for two years after they were driven from home

was very bad and open and the children nearly froze in it. The defendant refused to give them another. These questions were asked the prosecutrix and answered by her: "Q. State, please, how he came to cease furnishing you and how you came to leave that house you have just spoken of? A. Well, as far as I know how come him to quit furnishing me, he had no use for me on earth. That is what he told me and I wanted to stay with him and live with him and he said he was tired of me being around and hated to see me in the sight of him. Q. And for that reason he refused to furnish you longer? A. Yes, sir. * * * I couldn't stay there (namely in the bad open house) and I was obliged to do better. I had no way in the world of making a thing. I often told him if he would give me a certain part of the crop, enough to get my clothes and the children's, that I would not leave, but would stay there all the time * * * He told me that he loved somebody else better than he did me and he wouldn't live with me at all —that was the reason. I asked him what he wanted to get shed of me for and I begged to stay till the very last and I told him if he would tell his reasons why he wanted to get shed of me, if it was anything on earth I could help I would never do so no more, that I would rather be with him than to be with anybody else on earth, and be with my children and be at home. He just turned around and says 'Nancy, so far as what you have done, it is all right, but I don't love you and can't love you and I do love somebody else better than I do you,' and he made me leave. One morning he hauled my things out and his woman hauled in that evening. Q. Who was that woman? A. Jane Bush. Q. Well, at the time that you were living in this outhouse, as I will call it, three quarters of a mile from his house, who was living with him at his house? A. Jane Bush. Q. State to the jury what if anything you said to him—what proposition you made about coming back to live at the house afterwards and while Jane

Bush was still living there? A. I went to him time after time—I went to him because I loved him, too—God in heaven knows I did. I told him if he would let me come home and live with him I would mind him like a child, that I would do anything that was possibly in my power. I would do anything to stay with him and my children and keep us all together, that I would mind him like a child, and I honestly would—I offered everything that I could. Q. And did he accept or refuse? A. He said he wouldn't live with me to save my life; that he would die and go to hell before he would live with me. Q. He already told you he didn't love you and he loved this other woman better? A. Yes, sir. Q. Did he tell you who it was he loved better? A. No, sir. Q. Now, state to the jury if during that time you lived in that outhouse, if he furnished you and your children with clothes? A. No, sir, he never bought me but two cotton dresses during the whole time I worked for him; I knit for him, I sewed for him, I worked in the field for him, I done anything that he called on me to do. He bought me two cotton dresses and two pair of shoes, I believe, during the time, and if anything else I don't remember it; and he bought the children cotton dresses to do them and one very cheap flannel dress, two calicoes, or three, I won't say for certain which, during the time. No fine goods, no domestic, no flannel nor anything of that kind. Q. That covered two winters, did it, and one spring? A. Yes, sir. Q. Now, at the time you left this outhouse and moved away, you stated you did so because he refused to furnish you with any provisions any longer? A. Yes, sir. Q. State to the jury when you left how many of your children you took with you, and if not all, why not all? A. I just took one with me when I left, and he wouldn't take the others. I told him if he would furnish me meat to feed the children until I could hoe cotton and buy

meat to keep the children from suffering—I thought a heap of them—why I would take the children and not call on him for any more.   He told me he wouldn't furnish me nary bite of grub at all, but he would buy the children clothes if I would make them and put them on them, and he wouldn't furnish anything to eat—and of course the eating was what I didn't want them to suffer for, till I could hoe cotton."

The testimony shows in addition to this that the defendant's wife worked in the fields like a man while she lived with him and hired out to wash, picked cotton and did other services to get a living after he had driven her from home; also that he threatened to take her children if she didn't treat his mistress, Jane Bush, well.   The proof of this atrocious conduct on the part of the defendant does not rest on the testimony of the prosecutrix alone; it is fully supported by other witnesses. His uncle H. C. Hendrix swore:   "Tom said he wished she would leave, that he didn't want to feed her any longer— wasn't going to feed her any longer."   Dr. M. C. Burke testified that the defendant said to him that his wife was a nice woman, a virtuous woman but Jane Bush was a nicer and more agreeable woman, that he couldn't put up with his wife and didn't intend to live with her any longer.   Dr. Burke was called in by him on account of a false alarm about Jane Bush being pregnant.   The Doctor's testimony on this point is as follows:   "He told me she had fever and had missed her monthly and if she was in the family way or if he had her in the family way—something in that way to the best of my recollection—it would play hell about his divorce.   Q.   What did he say about wanting you, about destroying the child ?   A. He told me that he did and I told him that I wouldn't do it." The foregoing is enough of the testimony to burden the opinion with, though there is much more to the same effect.   It not only tends to prove but does prove beyond a doubt an incredibly heartless desertion by the defendant of a wife who clung

to him with canine affection through insupportable cruelties and indignities and a final refusal to furnish her the bare necessities of life.    It is difficult to abide with patience with the contention that the judgment should be reversed for want of evidence to support the verdict.    This objection is stereotyped and is urged in many cases in which there has been a jury trial without reason or excuse.    But the express limit is reached in the one at bar when it is claimed the court below should have sustained the demurrer to the evidence and that reversible error was committed when it refused to do so.    The verdict of the jury is remarkable for only one thing, the leniency of the punishment imposed.    The defendant contends that his wife's bad temper made it impossible for him to live with her but she testifies and the general trend of the evidence supports her, that they had no trouble except about the woman he kept.    His complaint that he was worried and annoyed by her scolding and fretting has failed, under the circumstances, to awaken our sympathy.    In refutation of the evidence that the prosecutrix left the defendant, there was offered and admitted a petition in a suit for divorce instituted by Hendrix against the wife on the twenty-sixth day of February, 1897, in which he charged her with such indignities as rendered his condition intolerable in that she refused to attend to her household duties, care for her children, talk with him or cook for his hired hands.

At that very time it appears, without contradiction, the prosecutrix was living with her children in the outhouse where the defendant had installed her.    He was refused a divorce on an ex parte hearing.    The admission of this evidence is assigned for error.    We think it was competent in connection with the other testimony in the case to prove the intention of the defendant to get rid of his wife entirely instead of to support her as he swears he always meant to do.    Finding no error in the record of which the appellant can complain the judgment is affirmed.    All concur.